**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JERRY BALDRIDGE, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PROSPECTS DM, INC. d/b/a SUPPORT FIRST,<br><br>Serve registered agent at:<br>Gonzalo Law LLC<br>600 Superior Avenue, East Suite 1600<br>Cleveland, Ohio 44113<br><br>Defendant. | ) | Case No.: 4:25-cv-5870<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

COMES NOW Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, and through his counsel of record, submits his Class Action Complaint against Defendant Prospects DM, Inc. d/b/a Support First, and states:

**INTRODUCTION AND BACKGROUND ON THE TCPA**

1. Plaintiff Jerry Baldridge ("Plaintiff" or "Baldridge") brings this case to protect his privacy rights, namely the right to be left alone from unwanted telemarketing phone calls.

2. Baldridge brings this suit to get telemarketers like Prospects DM, Inc. d/b/a Support First ("Defendant"), to stop incessantly calling his phone and the putative class members' phones despite the fact Plaintiff and the putative class members: 1) received prerecorded and/or artificial voice calls from or on behalf of Defendant; and, 2) registered their phones number on the National Do-Not-Call Registry ("DNC List").

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers' consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA provides protections from people receiving prerecorded or artificial voice calls, which are commonly referred to as robocalls and are referred to as robocalls throughout this Complaint. Specifically, the TCPA provides that each person who receives a prerecorded or artificial voice call in violation of the TCPA is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(b)(1)(A); 47 C.F.R. § 64.1200(a).

5. The TCPA also affords special protections for people who registered their phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

6. Since 2003, persons who register their cell phone numbers on the DNC List are considered to be "residential subscribers" for the purpose of 227(c)(5) and the DNC List. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

7. Highlighting the problems on incessant robocalls, between January and November 2025 alone, approximately 48.4 billion robocalls were placed in the United States.

RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Dec. 8, 2025).

8. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

9. In fact, in 2021 alone, there were over five million do-not-call complaints to the FTC about unwanted telemarketing calls. Federal Trade Commission, *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 5, 2022) *available at*: https://www.ftc.gov/news-events/news/press-releases/2022/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited Aug. 1, 2023).

10. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

**JURISDICTION AND VENUE**

11. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

12. This Court has personal jurisdiction over Defendant because Defendant transacts business in Texas, places telemarketing phone calls to persons in Texas (like Baldridge), utilizes Texas area codes in association with these telemarketing calls and for the reasons otherwise set forth in this Complaint.

13. Defendant knowingly and purposefully availed itself to Texas by calling Baldridge at his “254” area code, which is associated with the State of Texas.

14. Plaintiff is and at all times relevant was, a resident of Montgomery, Texas, which is within this District.

15. Plaintiff experienced the annoyance, frustration, and disruption from Defendant’s telemarketing calls while present in this District.

16. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claim arose in this District.

**PARTIES**

17. Baldridge is an individual who at all times material to this Complaint resided in and was a citizen of the Montgomery, Texas.

18. Baldridge is the owner of a cell phone. His cell phone number is 254-XXX-0022.

19. Baldridge registered his phone number on the DNC List on or about January 2, 2006, to obtain solitude from unwanted telemarketing calls.

20. Baldridge’s cell phone number is a personal phone number and is not a business line.

21. The monthly bill associated with Baldridge’s phone number is issued in Baldridge’s name, and not in the name of a business.

22. Baldridge uses his cell phone primarily for residential purposes, such as communicating with friends and family members.

23. Defendant is an Ohio limited liability company with its headquarters in North Ridgeville, Ohio.

24. Defendant's Articles of Organization that were filed with the Ohio Secretary of State, set forth the purpose of Defendant's business. This purpose includes "providing . . . call-center workers for companies in Ohio, across the United States and abroad."

25. Defendant registered the name "Support First" with the Ohio Secretary of State on July 5, 2018, as a name under which Defendant would transact business, and renewed this registration on March 21, 2023.

26. Defendant also has offices in California and in multiple countries.

27. Defendant has been in good standing to transact business throughout the United States, including in Texas, at all times relevant to this Complaint.

28. Defendant's website is www.prospectsdm.com ("Defendant's website").

29. Defendant's website states that it "specialize[s] in call centers" and that it believes "the best way to improve your profitability and grow your business is with more effective contact with customers and prospects."

30. Defendant's website states it offers "telemarketing services." Defendant's website states that these services are ideal for "direct sales" and "lead generation and qualification."

31. Defendant also has a LinkedIn profile.

32. Defendant's LinkedIn profile states that its specialties include "Telemarketing Services."

## DEFENDANT'S INCESSANT TELEMARKETING CALLS TO BALDRIDGE AND OTHER CONSUMERS

33. On April 6, 2023, at approximately 9:04 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

34. The phone number that appeared on Baldridge's phone was 254-256-5340.

35. The caller stated, "Hi, this is Kelly from Support First calling about your free or subsidized health insurance. Please call me back at toll free at 844-306-0130 to see if you qualify. And, and again that's 844-306-0130. Call now!"

36. The phone call was a voicemail that utilized a prerecorded and/or an artificial voice. Baldridge could tell this was a prerecorded and/or artificial voice because of the generic and form nature of the recording, the impersonal nature of the recording, and the computer sounded as if it had a glitch when the recording repeated the word "and" in an unnatural manner.

37. On April 6, 2023, at approximately 9:11 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

38. The phone number that appeared on Baldridge's phone was 254-223-6085.

39. Baldridge answered the call and said "hello" multiple times, with no response.

40. A prerecorded and/or artificial voice then stated, "Hi, this is Kelly from Support First calling about your free or subsidized health insurance. Please call me back toll free at 844-306-0130 to see if you qualify. And, and again that's 844-306-0130. Call now!"

41. Baldridge could tell this was a prerecorded and/or artificial voice because of the generic and form nature of the recording, the impersonal nature of the recording, the computer sounded as if it had a glitch when the recording repeated the word "and" in an unnatural manner, and because the caller's message was the exact same message Baldridge had received in the form of a voicemail minutes earlier.

42. On April 6, 2023, at approximately 9:21 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

43. The phone number that appeared on Baldridge's phone was 254-223-6063.

44. The caller on this call was a live caller. The caller stated they were "calling from Support First" and were calling about insurance. The caller then began asking a series of insurance-related questions and attempted to transfer Baldridge to another representative. The caller then again identified themselves as being with "Support First."

45. The call then disconnected, and the caller immediately called back and again disconnected. The phone number that appeared on Baldridge's phone was 254-223-6012.

46. On April 7, 2023, at approximately 11:43 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

47. The phone number that appeared on Baldridge's phone was 254-256-5340.

48. The caller stated, "Hi, this is Kelly from Support First calling about your free or subsidized health insurance. Please call me back at toll free at 844-306-0130 to see if you qualify. And, and again that's 844-306-0130. Call now!"

49. Baldridge could tell this was a prerecorded and/or artificial voice because of the generic and form nature of the recording, the impersonal nature of the recording, the computer sounded as if it had a glitch when the recording repeated the word "and" in an unnatural manner, and because the caller's message was the exact same message Baldridge had received in the form of the calls he previously received.

50. On April 11, 2023, at approximately 12:46 p.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

51. The phone number that appeared on Baldridge's phone was 254-256-5340.

52. The caller stated, “Hi, this is Kelly from Support First calling about your free or subsidized health insurance. Please call me back at toll free at 844-306-0130 to see if you qualify. And, and again that’s 844-306-0130. Call now!”

53. Baldridge could tell this was a prerecorded and/or artificial voice because of the generic and form nature of the recording, the impersonal nature of the recording, the computer sounded as if it had a glitch when the recording repeated the word “and” in an unnatural manner, and because the caller’s message was the exact same message Baldridge had received in the form of the calls he previously received.

54. On April 12, 2023, at approximately 9:32 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant’s behalf.

55. The phone number that appeared on Baldridge’s phone was 254-223-6085.

56. The caller stated, “Hi, this is Kelly from Support First calling about your free or subsidized health insurance. Please call me back at toll free at 844-306-0130 to see if you qualify. And, and again that’s 844-306-0130. Call now!”

57. Baldridge could tell this was a prerecorded and/or artificial voice because of the generic and form nature of the recording, the impersonal nature of the recording, the computer sounded as if it had a glitch when the recording repeated the word “and” in an unnatural manner, and because the caller’s message was the exact same message Baldridge had received in the form of the calls he previously received.

58. On April 12, 2023, at approximately 9:43 a.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant’s behalf.

59. The phone number that appeared on Baldridge’s phone was 254-223-6063.

60. The caller on this call was a live caller. The caller stated they were "calling from Support First" and were calling about a health insurance review. The caller then began asking a series of insurance-related questions, that were similar or identical to the questions asked by the previous live caller and attempted to transfer Baldridge to another representative. The caller then again identified themselves as being with "Support First."

61. On April 14, 2023, at approximately 12:35 p.m. Baldridge received a phone call on his cell phone from Defendant or someone acting on Defendant's behalf.

62. The phone number that appeared on Baldridge's phone was 254-318-6135.

63. The caller on this call was a live caller. The caller stated they were "calling from Support First" and were calling about a health insurance review. The caller then began asking a series of insurance-related questions, that were similar or identical to the questions asked by the previous live caller.

64. Prior to receiving these calls, Baldridge did not provide prior express written consent or any form of consent to Defendant or anyone acting on his behalf to call his cell phone.

65. Baldridge did not provide his phone number to Defendant or anyone acting on its behalf.

66. Baldridge had no prior business relationship with Defendant before receiving the calls at issue.

67. Baldridge never inquired of Defendant about any of its insurance products or services, or any of Defendant's products or services before he received the calls at issue.

68. Baldridge was not in the market for health insurance at the time he received the calls at issue.

69. Other consumers, like Baldridge, have complained about receiving unwanted

telemarketing calls from Defendant.

70. One consumer complained:

> . . . Prospects DM are a bunch of CLOWNS. . . . I've not been online to request any information from this company nor their affiliates. They are HARASSING as . . .I've blocked every number that they've called from. I've yelled at many of them to stop calling my phone. . . . There is NO reason for the continued calls, PERIOD. . . . .

71. Another consumer complained:

> HARASSMENT! . . . This business keeps calling me multiple times a day from a variety of different numbers, day/night/weekends/weekday. . . . Who are these annoying people from this annoying company? Where did they get my number? . . . .

72. Another consumer complained:

> This company will call my cell phone up to 25 times on any given day sometimes 10 minutes apart, all day long. They will use your local area code and out-of-state area codes. I have been fooled when I see my local area code and when I answer they do not say anything. This is harassment in its worst form. . . .

73. On information and belief, Defendant or someone acting on its behalf placed prerecorded voice calls to hundreds if not thousands of persons (*i.e.* putative class members), like Baldridge, without first obtaining said persons' "prior express written consent," or any form of consent, to receive such calls.

74. On information and belief, Defendant or someone acting on its behalf placed prerecorded voice calls to hundreds if not thousands of persons (*i.e.* putative class members) to persons whose phone numbers were on the DNC List.

75. Defendant's conduct of calling Baldridge and the putative class members privacy rights as they were subjected to annoying and harassing calls.

76. Defendant's conduct of calling Baldridge and the putative class members intruded upon Baldridge's and the putative class members' right to be left alone, and their interest of seclusion.

## DIRECT AND VICARIOUS LIABILITY

77. Without the benefit of discovery, because Defendant disclosed its identity, Baldridge assumes Defendant directly placed the calls.

78. However, if discovery reveals that some or all of the calls were made by third-party/parties on behalf of Defendant, then Defendant is vicariously liable for those calls.

79. On May 9, 2013, the FCC determined that this was not a basis for avoiding liability within a Declaratory Ruling that held that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

80. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id.* at 6587 n. 107.

81. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a

reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.,* at 6593.

82. If Defendant directly placed the calls at issue to Baldridge, Defendant is directly liable for those calls.

83. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers that are currently unknown to Baldridge and only known to Defendant.

84. In the event, Defendant's third-party telemarketers had actual and/or apparent authority to act on behalf of Defendant.

85. Likewise, Defendant also ratified its agents' violations of the TCPA by accepting leads and/or deriving profit from sales imitated by unlawful robocalls.

86. Defendant controlled or had the right to control the marketing activities of those acting on its behalf. Among other things, the calls received from Baldridge were similar in that they used a similar artificial voice script the live callers asked similar questions.

87. Defendant acted as a principal to telemarketing agent(s) whose identity or identities are unknown at this time.

88. Defendant is not permitted under the law to outsource and contract its way out of liability by directing and benefitting from its agents' TCPA violations.

89. For the counts identified below, if Defendant directly placed the call(s), it is directly liable. In the alternative, to the extent any call(s) were made by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful calls.

**Class Allegations**

90. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plaintiff brings this lawsuit as a class action on himself, and all others similarly situated. This action satisfies the requirements of Rule 23.

91. Plaintiff seeks to represent the following classes:

> **Prerecorded Voice Class:** All persons in the United States who from four years prior to the filing of this action through class certification to whom Defendant or someone acting on its behalf utilizing a pre-recorded or artificial voice call, to the recipient's phone.

> **DNC List Class:** All persons in the United States who from four years prior to the date of the filing of this lawsuit until the date of class certification: (1) to whom Defendant (or someone acting on its behalf) placed two or more calls during a 12-month period; (2) where the calls were made in connection with a campaign to solicit Defendant's products or services; and, (3) whose number was registered on the Do Not Call Registry for more than 30 days at the time the calls were received; (4) where the phone number is registered to an individual, rather than a business.

92. Plaintiff reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

93. The members of the proposed classes are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds or thousands of people have been harmed by Defendant's actions. The phone numbers of the members of the proposed class are readily identifiable through records available to Defendant or those acting on its behalf.

94. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

95. On information and belief, Defendant has called and continues to call people using artificial or prerecorded voice calls without first obtaining the recipient's prior express written consent and will continue to place telemarketing calls to persons whose numbers are registered on

the DNC List. It is reasonable to expect that Defendant will continue to send such text messages absent this lawsuit.

96. Common questions of law and fact exist as to all members of the proposed classes and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed classes include, but are not limited to:

a. Whether the voice technology used by Defendant or on its behalf constitutes a "pre-recorded voice" and/or "artificial voice" as defined by 47 U.S.C. § 227(b);

b. Whether Defendant exercised valid methods of obtaining express written consent before making calls to consumers;

c. If Defendant did not directly place the calls at issue, whether an agency relationship exists between Defendant and its telemarketing vendor(s);

d. Whether Defendant ratified the conduct of vendor(s)/agent(s);

e. Whether Defendant or someone acting on its behalf placed prerecorded voice calls to Plaintiff and the putative class members without the appropriate form of consent;

f. Whether Defendant or someone acting on its behalf placed prerecorded voice calls to Plaintiff and the putative class members without the appropriate form of consent;

g. Whether Defendant's conduct violates 47 U.S.C. § 227(b);

h. Whether Defendant's conduct violates 47 U.S.C. § 227(c);

i. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and,

j. Whether Plaintiff and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

97. Plaintiff's claims are typical of the claims of the proposed class members because their claims arise from the same practice that gives rise to the claims of the members of the proposed classes and are based on the same legal theories.

98. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the proposed classes. Plaintiff's interests do not conflict with the interests of the proposed classes they seek to represent. Plaintiff has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

99. Plaintiff's counsel will vigorously litigate this case as a class action, and Plaintiff and his counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

100. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

101. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

102. Questions of law and fact, particularly the propriety of placing prerecorded voice calls without first obtaining prior express written consent and calling phone numbers on the DNC List, predominate over questions affecting only individual members.

103. Defendant has acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**Count I - Violations of the Telephone Consumer Protection Act ("TCPA")**
**47 U.S.C. § 227(b) *et seq.* (Artificial or Prerecorded Voice Calls – Prerecorded Voice Class)**

104. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this count.

105. The TCPA provides, in part:

> It shall be unlawful . . . (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone . . . .

47 U.S.C. § 227(b)(1)(A)(iii).

106. The TCPA also prohibits calls using an artificial or pre-recorded voice to "any residential telephone line" without prior express written consent. 47 U.S.C. § 227(b)(1)(B).

107. The TCPA defines a "telephone solicitation" as a "call or message for the purpose of encouraging the purchase of goods, or services which is transmitted to any person." 47 U.S.C. § 227(a)(4).

108. The Federal Communications Commission's regulations implementing the TCPA provide that telephone solicitations cannot be made to a recipient without the recipient's "prior express written consent." *See* FCC 12-21, CG Docket 02-278 (effective October 16, 2013); 47 C.F.R. § 64.1200(a)(2)

109. The term "prior express written consent" as defined by the Code of Federal Regulations means "an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(8)(i).

110. The TCPA provides for a private right of action and statutory damages of $500 per violation, and up to $1,500.00 per violation. 47 U.S.C. § 227(b)(3).

111. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA of placing prerecorded or artificial voice calls without first obtaining prior express written consent to place such calls. *See* 47 U.S.C. § 227(b)(3).

112. By placing artificial or prerecorded voice calls to Plaintiff's and the putative class members' cell phone numbers, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. § 227(b) and the TCPA's corresponding regulations.

113. Defendant or those acting on its behalf willfully violated the TCPA when placing prerecorded voice calls to Plaintiff and the putative class members' cell phones.

114. Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call made by Defendant or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, request that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed Prerecorded Voice class, appointing Plaintiff as the class representative, and appointing Plaintiff's counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the Prerecorded Voice Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(b), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

e. Enter judgment in favor of Plaintiff and the Class for all costs; and,

f. Award Plaintiff and the Class such further and other relief the Court deems just and appropriate.

**Count II - Violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c) *et seq.* (National DNC List Violations – DNC List Class)**

115. Plaintiff incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

116. The TCPA provides that is a violation of the law for a person whose phone number is registered on the National Do Not Call Registry to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

117. The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the

violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

118. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

119. By making calls to Plaintiff and the putative class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

120. Defendant or those acting on its behalf knew or should have known that Plaintiff's and the putative class members' phone numbers were registered on the DNC List.

121. Defendant or those acting on its behalf willfully violated the TCPA when placing the calls to Plaintiff's and the putative class members' cell phones.

122. Plaintiff and the putative class members are entitled to damages of up to $500.00 per violation for each call made by Defendant or those acting on its behalf that the Court finds violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Jerry Baldridge, individually, and on behalf of all others similarly situated, request that the Court:

a. Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the DNC List class, appointing Plaintiff as the class representative, and appointing Plaintiff's counsel as class counsel;

b. Enter judgment in favor of Plaintiff and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief,

statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c. Enter a judgment in favor of Plaintiff and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d. Enter judgment in favor of Plaintiff and the Class for all applicable pre-judgment and post-judgment interest amounts;

e. Enter judgment in favor of Plaintiff and the Class for all costs; and,

f. Award Plaintiff and the Class members such further and other relief the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Please take notice that Plaintiff demands a jury trial.

Dated: December 8, 2025

BUTSCH ROBERTS & ASSOCIATES LLC

*/s/Christopher E. Roberts*
Christopher E. Roberts Fed. No. 3708019
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700
CRoberts@butschroberts.com

*Attorneys for Plaintiff*